Opinion issued August 7, 2018



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00533-CR

———————————

**BRANDEN MASSEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 421st District Court**
**Caldwell County, Texas[1]**
**Trial Court Case No. 2016-183**

---

## MEMORANDUM OPINION

A jury found appellant, Branden Massey, guilty of aggravated assault with a

deadly weapon and assessed his punishment at ten years' confinement.[2]  In three

---

[1]    This case is before this Court on transfer from the Third Court of Appeals in Austin pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. 73.001 (West 2017).

issues on appeal, appellant contends that: (1) he suffered egregious harm from the trial court's failure to charge the jury that the corroboration requirement for accomplice testimony applied to the jury's consideration of his criminal liability under the law of parties; and, (2) and (3) he suffered egregious harm because of errors in the jury charge on punishment, which misinformed the jury of his parole eligibility. We affirm.

## Background

Appellant was indicted for shooting Shawn Ruckman, the complainant, three times with a handgun in the parking lot of an H&R Block in Caldwell County, Texas. At trial, Ruckman testified that he had a negative relationship with appellant's mother, Lana Cochran, due to a previous romantic interaction between them. Ruckman claimed Cochran had sent men to beat him up several months before the shooting occurred. In contrast, appellant testified that Cochran had told him and others that Ruckman had attempted to rape her and run her over with a truck. Other witnesses, including appellant's girlfriend, Jessica Murphy, and various family members, testified that Ruckman and Cochran had a difficult relationship.

---

[2] *See* TEX. PENAL CODE ANN. § 22.01(a)(2), 22.02(a)(2) (West 2011 & Supp. 2017).

On June 15, 2016, the day before the shooting, Cochran's friend, Keith Lopez,[3] called to inform her that he had seen Ruckman rummaging through the trash at the RV park where Lopez lived, and he asked if Cochran knew why Ruckman was there. The call motivated Cochran, appellant, Murphy, and appellant's friend C.J.—a homeless man who had not been formally identified by police at the time of trial—to drive to the RV park in the early morning hours of June 16, 2016.

Prior to driving to the RV park, appellant drove to a nearby Wal-Mart where Ruckman had stopped to get supplies for work his parents had asked him to do at the H&R Block they owned. Ruckman testified that he went to buy a tool early in the morning so he could work for a few hours before the heat of the day set in. Surveillance footage from the Wal-Mart parking lot shows that appellant's vehicle arrived at Wal-Mart and drove around the parking lot during the time that Ruckman was inside the store. The surveillance video shows appellant's vehicle pulling next to Ruckman's truck. The passenger side door of appellant's vehicle opened, and a man fitting appellant's description exited. The video shows that he went under Ruckman's truck for a moment, and he then got back into the car and drove off at 2:30 a.m. Murphy testified that she, appellant, Cochran, and C.J.

---

[3]     Ruckman testified that Lopez was one of the men Cochran had sent to beat him up prior to the shooting.

waited in the parking lot for a period of time, and she admitted that she watched Ruckman's truck through binoculars while they waited.

Appellant and the other three people with him—Cochran, Murphy, and C.J.—eventually drove to Lopez's home at the RV park, where they spent the next few hours. Murphy testified that before they arrived Cochran had texted Lopez asking him where she could find "a piece," referring to a handgun. Lopez denied seeing Cochran with a gun, and he denied helping her to procure one. However, Lopez testified that appellant had a gun in his waistband when he arrived.

Meanwhile, Ruckman left the Wal-Mart and went straight to his truck. After starting it, he stepped back out and checked on the truck, then drove off at 2:59 a.m. Around 4:15 a.m., Ruckman called Jeffery Nix, an old friend of his, telling him that his truck had broken down in the H&R Block parking lot and he needed help. Nix testified that Ruckman was nervous on the phone and believed that someone had intentionally cut his serpentine belt. When Nix arrived, Ruckman was holding the old belt in his hand, and it appeared to Nix that it had been cut, not worn down. Ruckman likewise testified that he was concerned about the damage to his truck due to Cochran's having previously sent men to assault him. Ruckman and Nix worked on the truck for around half an hour. The work was slow going, as Nix had brought the wrong belt size. While they were working, Murphy, Cochran, appellant, and C.J. drove up.

4

According to Murphy, she and C.J. were sitting in the back seat, Cochran was driving, and appellant was in the front passenger's seat. Cochran and appellant had a brief conversation, then someone rolled down the front passenger window. Murphy testified that appellant fired three shots at Ruckman. One shot grazed Ruckman's elbow, another went through his abdomen, and the third went through his other elbow. He cried out, "[T]hey shot me," alerting Nix. Nix testified that he saw a "white male, [with a] thin moustache, [wearing a b]lue ball cap" whom he had never met before. He also testified that the driver was female and appeared to be in her twenties, and she "had her hair up."

Appellant and the rest of the group fled the scene of the shooting. Murphy testified that Cochran, who had been driving, switched places with C.J.—an African-American male—so that the police would not be able to recognize a female driver. Murphy testified that, as they were driving, appellant threw the shell casings and clip from the window. When they returned home, Cochran and C.J. left together, while appellant and Murphy stayed at their apartment.

After the shooting, Nix called 911. Officer D. Lewis with the Lockhart Police Department was the first to respond to the scene. He took care of Ruckman until EMS and other officers arrived, then he began to photograph the scene and collect evidence. He found three bullet slugs: one caught in the ground, and two on the ground near Nix's truck. He found no shell casings, but then found the cut

5

serpentine belt on the ground near Ruckman's truck. There were several bloodstains on the ground under and around Ruckman's truck.

Officer T. Larivee went to the surrounding businesses and obtained surveillance footage, from which he was able to discern appellant's vehicle's license plate. Police determined that the vehicle was actually registered to Barbara Reynolds, appellant's grandmother, and they contacted her.

Meanwhile, appellant and Murphy were arguing about the shooting, and at some point that afternoon Barbara Reynolds called them. She was frantic, as the police had been to her house and told her the rough details of what had happened. Appellant refused to speak to her, so she spoke with Murphy. Afterwards, Murphy was upset, and she ultimately called the police and told them what had happened.

On June 21, 2016, appellant was arrested. In a police interview conducted the next day, he was cooperative. While he did not admit to shooting Ruckman, he admitted to cutting the serpentine belt and to being present at the H&R Block parking lot on the morning of the shooting. Cochran was also interviewed but remained uncooperative.

Appellant asserted throughout trial that Murphy—who testified that appellant fired the shots at Ruckman—and Lopez—who testified that appellant had a gun when he arrived at the RV park on June 16, 2016—were accomplices to the shooting. Thus, he argued that their testimony was not sufficient by itself to

6

convict him and had to be corroborated by other evidence. During the charge conference, appellant argued that that Lopez and Murphy were accomplices as a matter of law and asked that the jury be charged accordingly. The trial court denied this request, considering them accomplices as a matter of fact instead. The guilt-innocence charge thus contained a general instruction on accomplice-witness testimony, identifying Murphy and Lopez as potential accomplices as a matter of fact.

The jury found appellant guilty of aggravated assault. It also made an affirmative finding that appellant used or displayed a deadly weapon in the course of committing the assault.

During the punishment phase of the trial, appellant introduced the testimony of several character witnesses from his family, including his father, aunt, and uncle. He also introduced the testimony of Gary Howard, the Deputy Director for the Caldwell County Adult Probation Office, who explained the specifics of community supervision to the jury.

Appellant attempted to portray himself as a good man under the negative influence of his beloved mother, who had fed him stories about Ruckman's assaulting her. Specifically, punishment witnesses testified that, prior to the shooting, Cochran had been living with appellant and Murphy on and off. Several members of appellant's family testified during the punishment phase that Cochran

was a terrible influence on her son. Since her arrival, the apartment complex that appellant lived in and worked at had fired him for "slacking off."

The State contended that appellant's actions were premeditated and violent. It argued that appellant avoided committing murder only by the luck of the circumstances.

Appellant sought community supervision, and the court provided the jury this written and verbal charge concerning punishment assessment, including instructions on the punishment range for appellant's offense, law regarding eligibility for community supervision, and law regarding good conduct time and eligibility for parole.

The jury assessed appellant's punishment at ten years' confinement without a fine. The jury did not recommend community supervision.

## Standard of Review for Charge Error

In evaluating complaints of jury charge error, we conduct a two-step analysis. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). We first determine whether an error occurred. *Id.* If an error exists, we must decide whether the error caused enough harm to warrant reversal. *Id.* at 744; *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). If the court finds error, the standard of review applied in assessing the harm caused by the error depends on whether the error in the charge was subject to timely objection in the trial court.

8

*Ngo*, 175 S.W.3d at 743–44; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). If there is a timely objection to the error at trial, the appellant must only demonstrate "some harm" to warrant reversal. *Ngo*, 175 S.W.3d at 743; *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). When there is no timely objection to the error at trial, reversal is granted only if the appellant suffered "egregious harm" because of the erroneous charge. *Ngo*, 175 S.W.3d at 743–44; *Almanza*, 686 S.W.2d at 171.

An egregious harm determination is based on a finding of actual rather than theoretical harm. *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015) (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)). However, there does not need to be direct evidence of the actual harm in order to establish egregious harm. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (citing *Castillo-Fuentes v. State*, 707 S.W.2d 559, 563 n.2 (Tex. Crim. App 1986)). In determining whether an appellant suffered egregious harm, the court considers "(A) the entire jury charge; (B) the state of the evidence[,] including contested issues and the weight of probative evidence; (C) the parties' arguments; and (D) all other relevant information in the record." *Arrington*, 451 S.W.3d at 840 (citing *Almanza*, 686 S.W.2d at 171); *Hutch*, 922 S.W.2d at 171 (explaining that egregious harm is examined on case-by-case basis and that reviewing court may consider any relevant information from trial record). Errors cause egregious harm

if they affect the very basis of the case, deprive the defendant of a valuable right, vitally affect a defensive theory, or make the case for conviction significantly more persuasive. *Hall v. State*, 937 S.W.2d 580, 583 (Tex. App.—Texarkana 1996, pet. ref'd) (citing *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)).

### Guilt-Innocence Charge

In his first issue, appellant contends that he suffered egregious harm from the trial court's failure to charge the jury that the corroboration requirement for accomplice testimony applied to the jury's consideration of his criminal liability under the law of parties.

**A.    Relevant Facts**

The jury charge for the guilt-innocence phase set out "general principles of law that must govern [the jury's] decision [in] this case." One of those general principles was an instruction on accomplice testimony. The general instruction on accomplice testimony informed the jury that it "cannot convict the defendant based solely on the testimony of an accomplice unless you first believe that the accomplice's evidence is true and that it shows the defendant is guilty of the offense charged against him." It further stated, "Even then you cannot convict the defendant unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged. The corroboration is not

sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission."

The general instruction on accomplice testimony applied this law specifically to Murphy and Lopez:

> [I]f you believe from the evidence beyond a reasonable doubt that an offense was committed and you further believe from the evidence that the witnesses Jessica Murphy and Keith Lopez were accomplices, or you have a reasonable doubt as to whether they were or not, as that term is defined in the foregoing instructions, then you cannot convict the defendant upon the testimony of Jessica Murphy and Keith Lopez unless you first believe that the testimony of Jessica Murphy and Keith Lopez is true and that it shows the defendant is guilty as charged in the indictment; even then you cannot convict the defendant unless you further believe that there is other evidence in the case, outside of the evidence of Jessica Murphy and Keith Lopez tending to connect the defendant with the commission of the offense charged in the indictment, and then from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty.

The following paragraph under the "general principles" section of the charge was an instruction on "responsibility for conduct of another as a party," instructing the jury that "[a] person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." The charge generally set out the elements that the State was required to prove to establish that "a person is guilty of an offense committed by the conduct of another." This paragraph did not contain any application of the law to the particular facts of appellant's case.

11

The charge then specifically instructed the jury that appellant had been charged with "intentionally, knowingly, or recklessly caus[ing] bodily injury to Shawn Ruckman" by using or exhibiting "a deadly weapon, specifically, a firearm." The charge set out the statutory elements for proving aggravated assault, defined key terms such as "bodily injury," and then provided the following instruction on the "application of law to facts":

> You must determine whether the state has proved, beyond a reasonable doubt, three elements. The elements are that—
>
> 1. the defendant, in Caldwell County, Texas on or about the 16th day of June, 2016 caused bodily injury to Shawn Ruckman; and
>
> 2. the defendant did this—
>     a. intending to cause bodily injury; or
>     b. knowing that he would cause bodily injury; or
>     c. with recklessness about whether he would cause bodily injury; and
>
> 3. the defendant, during the alleged assault, used or exhibited a firearm, a deadly weapon.
>
> You must all agree on elements 1, 2, and 3 listed above, but you do not have to agree on the culpable mental states listed in elements 2.a, 2.b, and 2.c above.
> If you all agree the state has failed to prove, beyond a reasonable doubt, one or more of elements 1, 2, and 3 listed above, you must find the defendant "not guilty."
> If you all agree the state has proved, beyond a reasonable doubt, each of the three elements listed above, you must find the defendant "guilty."

The charge did not instruct the jury on the law of parties as it related to finding appellant guilty of the charged offense.

**B.      Analysis**

Appellant contends that "the trial court's failure to charge the jury that the law of accomplice testimony applied to the jury's consideration of [his] criminal liability under the law of parties" was erroneous and caused him egregious harm. Appellant cites *Zamora v. State*, 411 S.W.3d 504 (Tex. Crim. App. 2013), in support of his argument.

Before a conviction can be based on an accomplice's testimony, the testimony must be corroborated by other evidence tending to connect the accused to the crime. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2014); *Zamora v. State*, 411 S.W.3d 504, 509 (Tex. Crim. App. 2013). A proper accomplice-witness instruction explains the definition of accomplice, as well as explaining the need for corroboration of evidence if the witness is an accomplice. *Zamora* 411 S.W.3d at 510.

In *Zamora*, the Court of Criminal Appeals held that the conspiracy theory of party liability applies in the accomplice-witness context because "an accomplice is a person who may be charged with the same or lesser-included offense as that with which the defendant is charged" and "a person may be charged with an offense as a principal, a direct party, or as a co-conspirator." *Id.* at 511 (addressing question of whether testimony from co-conspirator triggers requirement for accomplice-witness instruction). The Court of Criminal Appeals also held in *Zamora* that all

complaints about the trial court's failure to include an accomplice-witness instruction must be analyzed under the procedural framework set out in *Almanza*. *Id.* at 512–13. The reasoning in *Zamora* does not support appellant's complaint because the trial court here gave an accomplice-witness instruction, and appellant does not complain of any inadequacy in the trial court's general instructions on the law of accomplice witnesses and corroboration.

Appellant cites no authority requiring that the jury charge expressly reiterate the applicability of the accomplice witness instruction to the following paragraph regarding the law of parties. *See Vasquez v. State*, 389 S.W.3d 361, 367 n.16 (Tex. Crim. App. 2012) ("It is unnecessary to repeat every abstract definition in the application paragraph of the jury charge."); *Roys v. State*, 416 S.W.3d 229, 236 (Tex. App.—Amarillo 2013, pet. ref'd) (addressing similar issue and citing *Vasquez*). The wording of the jury charge, as a whole, made it clear that the instruction on accomplice-witness testimony was one of the "general principles of law that must govern [the jury's] decision [in] this case." The accomplice-witness instruction immediately preceded the instruction on the potential criminal liability under the law of parties. We conclude that the jury would have understood that it was to consider all of the instructions contained in the charge, and, absent evidence to the contrary, we must presume that the jury understood and followed the instructions. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005)

14

(holding that appellate courts generally presume jury follows trial court's instruction in manner presented and that presumption is rebuttable, but appellant must rebut presumption by pointing to evidence that jury failed to follow instruction); *Roys*, 416 S.W.3d at 236.

We overrule appellant's first issue.

## Charge on Punishment

In his second and third issues, appellant contends that he suffered egregious harm as a result of errors in the punishment jury charge, which misinformed the jury on the law of parole eligibility.

### A. Relevant Facts and Law

Following the jury's finding that appellant was guilty of aggravated assault, the trial court charged the jury regarding appellant's punishment. The punishment charge informed the jury that the punishment range for aggravated assault was between two and twenty years' confinement and a fine of no more than $10,000.

The jury also made an affirmative finding that appellant used or displayed a deadly weapon in the course of committing the aggravated assault. The entry of a deadly weapon finding affects appellant's eligibility for parole. *See Duran v. State*, 492 S.W.3d 741, 745 (Tex. Crim. App. 2016).

Government Code section 508.145(d)(2) states that an inmate serving a sentence for an offense which includes an affirmative deadly weapon finding "is

not eligible for release on parole until the inmate's actual calendar time served, without consideration of good conduct time, equals one-half of the sentence or 30 calendar years, whichever is less, but in no event is the inmate eligible for release on parole in less than two calendar years." TEX. GOV'T CODE ANN. § 508.145(d)(1)–(2) (West Supp. 2017). Under these circumstances, Code of Criminal Procedure article 37.07, section 4(a) requires that the trial court instruct the jury as follows:

> Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

> It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time the defendant may earn. If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

> It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

16

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(d) (West Supp. 2017).

Here, the charge instructed the jury on "parole and good conduct time" as set out above, except that, in the paragraph regarding eligibility for parole, it stated,

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served plus any good conduct time earned equals one-half of the sentence imposed. Eligibility for parole does not guarantee that parole will be granted.

The trial court's charge thus failed to instruct the jury that appellant's eligibility for parole would be made "without consideration of any good conduct time the defendant may earn," and it failed to instruct the jury, "If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole." *See id.*

Finally, the charge instructed the jury on appellant's eligibility to be granted community supervision. The charge informed the jury that "'Community supervision' is often called 'probation'" and that "[t]he two terms mean the same thing." The jury was instructed that it could "recommend that the confinement assessed by [the jury], any fine assessed by [the jury], or both, be suspended and

17

the defendant placed on community supervision." The charge set out the requirements for making such a recommendation.

Closing arguments by both the State and appellant focused on whether probation was an appropriate punishment for appellant. The State argued that a probated sentence was not appropriate because appellant's acts were deliberate and violent. Appellant, however, sought a probated sentence, arguing that he was a good person with no serious prior legal problems who was led astray by the bad influence of his mother. Neither party nor the trial court discussed the issue of eligibility for parole.

The jury deliberated for less than twenty minutes. It did not send any notes expressing confusion regarding the punishment charge. The jury assessed appellant's punishment at ten years' confinement without a fine, and it did not recommend community supervision.

## B.    Analysis

Appellant argues that the trial court's instruction regarding when he would be eligible for parole provided the jury with inaccurate information. He argues that, contrary to the trial court's instruction, "good conduct time does not play a factor in [his] parole eligibility." Appellant also argues that "[t]he jury was further misadvised by not being told of the two year minimum [he] would be required to serve for any sentence of two years to less than four years." He argues, "Clearly,

the charge misapplied the law to the particular facts of this case and therefore failed to lead the jury to the threshold of its duty." Appellant also acknowledges that he failed to object to the punishment charge and thus is required to show that the errors cause egregious harm.

The State concedes that the punishment charge was erroneous with regard to parole eligibility and good conduct time credit. However, it argues that appellant failed to show egregious harm as a result of the error.

Appellant argues, in part, that this case "is one of those rare instances where erroneous jury instructions alone caused egregious harm." The cases cited by appellant involved charge errors that mistakenly charged the jury on the State's burden of proof. *See Ruiz v. State*, 753 S.W.2d 681, 686–87 (Tex. Crim. App. 1988) (finding defendant suffered egregious harm from erroneous charge that failed to properly instruct jury on State's burden of proof and effectively lowered State's burden); *Manning v. State,* 730 S.W.2d 744, 750 (Tex. Crim. App. 1987) (finding egregious harm when charge incorrectly instructed jury on State's burden of proof on defendant's competency). The nature of the errors here—incorrectly informing the jury that good conduct time would be considered in determining appellant's eligibility for parole and failing to state that he would be required to serve a minimum of two years in the event he was sentenced to less than four years' confinement—do not rise to the same level of harm, in and of themselves, as

19

do charge errors that might affect the jury's understanding of the State's burden of proof. Thus, we conclude that these cases are distinguishable, and appellant has not established that the erroneous instruction alone caused egregious harm.

Rather, in determining whether the errors here caused appellant egregious harm, we consider the entire jury charge; the state of the evidence, including contested issues and the weight of probative evidence; the parties' arguments; and all other relevant information in the record. *See Arrington*, 451 S.W.3d at 840.

Considering the charge as a whole, the misstatements of law were relatively isolated. Rather than instructing the jury that appellant would "not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, *without consideration of any good conduct time* the defendant may earn," the charge here instructed that "he will not become eligible for parole until the actual time served *plus any good conduct time earned* equals one-half of the sentence imposed." And the charge failed to instruct the jury that, "[i]f the defendant is sentenced to a term of less than four years, [he] must serve at least two years before [he] is eligible for parole." The remainder of the trial court's punishment charge on parole and good conduct time tracked the statutorily required language.

Furthermore, the jury was also instructed, correctly, that "[e]ligibility for parole does not guarantee that parole will be granted," and that it "cannot

20

accurately be predicted how the parole law and good conduct time might be applied to this defendant if sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities." The jury was permitted to consider the existence of parole law and good conduct time, but it was instructed "not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant," and it was instructed "not to consider the manner in which the parole law may be applied to this particular defendant." Thus, the jury was instructed not to consider how good conduct time might be applied to appellant, and there is no evidence in the record to rebut the presumption that the jury followed this instruction. *See Ross v. State*, 133 S.W.3d 618, 624 (Tex. Crim. App. 2004) (citing this factor in determining that there was no reasonable likelihood that jury applied misleading parole charge in way that prevented jury from properly considering defendant's punishment) (citing *Luquis v. State*, 72 S.W.3d 355, 664–68 (Tex. Crim. App. 2002)); *see also Thrift*, 176 S.W.3d at 224 (holding that, absent contrary evidence, we presume trial court understood and applied trial court's instructions in jury charge).

Regarding other relevant information in the record, including the state of the evidence and the parties' arguments, we observe that neither the trial court nor the State emphasized the improper instruction. Both the State and appellant devoted

21

their closing arguments to addressing appellant's eligibility for community supervision and did not address at all the effect that the potential for parole should have in the jury's punishment deliberations. *See Luquis*, 72 S.W.3d at 367 ("Neither the prosecutor nor defense attorney discussed good conduct time in argument or urged the jury to assess a greater (or lesser) sentence based upon any potential good conduct time credit."). As in *Ross*, "[t]he jury did not send out any notes indicating or expressing confusion about the possible application of good conduct time to appellant." *See* 133 S.W.3d at 624 (quoting *Luquis*, 72 S.W.3d at 367). And appellant received a sentence of ten years' confinement, which is well within the punishment range for aggravated assault and is "unsurprising" considering the nature of appellant's actions here, which the State argued were violent, premeditated, and nearly resulted in a murder rather than an assault. *See Luquis*, 72 S.W.3d at 367–68 ("Although appellant received the maximum sentence possible, life in prison, that is unsurprising given appellant's crime, his cavalier confession, and his abysmal prior criminal record.").

Examining the charge in its entirety and the other relevant record evidence, we conclude that appellant has failed to demonstrate any harm that affected the very basis of the case, that deprived him of a valuable right, that vitally affected a defensive theory, or that made the State's punishment case significantly more persuasive. *See Ross*, 133 S.W.3d at 624; *Hall*, 937 S.W.2d at 583.

We overrule appellant's second and third issues.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).